UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

TYNESHIA BROWN,

Plaintiff

DECISION AND ORDER

-vs-

04-CV-6399 CJS

JO ANNE B. BARNHART,
Commissioner of Social Security,

Defendant.

---

APPEARANCES

For the Plaintiff: Catherine M. Callery, Esq.
Louise Tarantino, Esq.
Empire Justice Center
80 St. Paul Street, Suite 660
Rochester, New York 14604

For the Defendant: Kathleen Mehltretter, Esq.
Acting United States Attorney for the
Western District of New York
Christopher V. Taffe, Esq.
Assistant United States Attorney
100 State Street
Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner"), which denied plaintiff's application for disability insurance benefits. Now before the Court is plaintiff's motion for judgment on the pleadings [#10] and defendant's cross-motion for an order remanding the matter for a new hearing [#11]. For the reasons stated below, defendant's application is denied, plaintiff's application is granted, and this matter is remanded to the Commissioner solely for the calculation of benefits.

## ISSUES PRESENTED

The issue presented in this case is whether the matter should be remanded to the Commissioner for a new hearing, or remanded solely for the calculation of benefits.

## FACTUAL BACKGROUND

Plaintiff, an unmarried female with a high school education, was twenty-four years old at the time of the administrative hearing at issue in this case.[1] Plaintiff has lived on her own at various times, and also stayed with her grandmother at times. Plaintiff is able to drive and owns a car. Plaintiff has never held full-time employment for than a few months.

## MEDICAL EVIDENCE

Plaintiff began to experience chronic headaches in or about 1996. (453-54)[2] Plaintiff's treating internist, Charles F. Courtsal, M.D. ("Courtsal"), stated on May 16, 1997, that due to migraines, plaintiff should not climb, stoop, bend, lift or carry, push or pull, or move at a high rate of speed. (481) In 1998, plaintiff, who was morbidly obese, underwent gastric bypass surgery. (482-86, 497) At that time, plaintiff was suffering from chronic back and leg pain caused by her obesity. (Id.) In an attempt to find a cause for plaintiff's headaches, an MRI was performed on October 8, 1998, which showed signs "consistent with mild mastoiditis," but was otherwise normal. (500) On July 30, 1999, Courtsal stated that petitioner had the following work restrictions: "She has difficulty with stooping, lifting or carrying, pushing and pulling due to back pain.

---

[1]As discussed below, there have been two administrative hearings in this case. Plaintiff was 24 at the time of the second hearing.

[2]Unless otherwise noted, citations are to the administrative record.

She has difficulties with high rates of speed, loud music and strong smells or heights due to migraine disorder." (456)

Plaintiff began to seek psychiatric treatment in 1998. On December 16, 1998, plaintiff was seen at the Genesee Mental Health Center, at the suggestion of her grandmother. At that time, plaintiff denied hearing "voices," but stated that, "my conscience tells me what to do." (507) Plaintiff stated that she did not think she could work, because she could not tolerate people or concentrate for long periods. (Id) On December 28, 1998, Ronald Biviano M.D. ("Biviano") examined plaintiff and noted that she was complaining of having depression and auditory hallucinations her entire life. (505) Plaintiff also complained of "decreased energy, decreased motivation, anhedonia[3], decreased libido, insomnia, decreased appetite, and poor concentration." (Id.) On January 25, 1999, Biviano noted that plaintiff was continuing to complain of "auditory hallucinations consisting of conversations in her head." (502) Initially, Biviano's impression was to rule out "major depression with psychotic features" and "schizoaffective disorder," and he increased plaintiff's prescription of Paxil and convinced plaintiff to take Zyprexa. (Id.)[4]

On May 3, 1999, John Thomassen, Ph.D. ("Thomassen"), a consultative agency psychologist, examined plaintiff. Plaintiff told Thomassen that she heard voices when she had headaches. Her speech was slow and slurred, but otherwise appropriate. (514) Her affect was "constricted," and "[h]er thought processes were slow and

---

[3]"Anhedonia" is "a psychological condition characterized by an inability to experience pleasure in normally pleasurable acts." Merriam Webster's Medical Desk Dictionary (1993) 34.

[4]Plaintiff has been prescribed a variety of medications, including Nortriptyline and Zomig for migraines, Paxil for depression, and Zyprexa for schizo-affective disorder. (456, 517)

generally dull with no evidence of thought disorder." (Id.) Her attention and concentration were impaired, as was her memory. Thomassen noted that plaintiff's cognitive functioning was "in the borderline range," and that her insight was limited and her judgment questionable. Thomassen's diagnosis was "schizoaffective disorder, depressive type," "cognitive disorder, not otherwise specified with avoidant traits," and "personality disorder, not otherwise specified with avoidant traits." (516) Thomassen noted that plaintiff was "likely to have significant difficulties following simple directions, doing rote tasks under supervision and doing complex tasks given her difficulties with attention, concentration and reality orientation at times. She is likely to have difficulty relating with coworkers and coping with stress." (515) Thomassen further stated that plaintiff presented with "significant psychiatric difficulties and would likely benefit from a structured treatment program." (516)

On May 3, 1999, Samuel Balderman, M.D. ("Balderman"), a consultative agency physician, examined petitioner and found that she had no physical exertional limitations. (517-19) Balderman noted that plaintiff complained of severe headaches, but had not seen a neurologist.

Allen D. Pettee, M.D. ("Pettee"), a private neurologist, examined plaintiff on March 15, 2000 upon a referral from Dr. Courtsal. Pettee noted that plaintiff was complaining of "nearly daily headache [sic], perhaps at least four to five days a week, in which she will get severe temple pounding pain, which can be prostrating, associated with nausea, vague visual changes, and a feeling like she simply wants to lie down." (561) Pettee stated that plaintiff's MRI was normal, except for the suggestion of mastoiditis. Pettee opined that plaintiff "has chronic daily headache [sic] which is likely

occurring on the basis of migraine," and he recommended various prescription medications. (561-62)

Between May 6, 1999 and April 28, 2000, plaintiff was seen on at least seventeen occasions by Joyce M. Smith, MSW ("Smith"), at the Genesee Hospital Department of Psychiatry. (533-601) During that period Dr. Biviano monitored plaintiff's treatment and medication. On January 13, 2000, Biviano saw plaintiff, who stated that she continued to be depressed and to experience auditory hallucinations. Biviano's impression was "schizo-affective disorder versus major depression with psychotic features," and he increased plaintiff's Risperdal and Zoloft prescriptions. (602) On March 8, 2000, Biviano saw plaintiff again, and again noted that she was complaining of depression and auditory hallucinations. Biviano opined that plaintiff had poor insight and marginal judgment. (603) Biviano's impression was "major depression with psychotic features rule out mood disorder related to migraine headaches," "personality disorder [not otherwise specified]," and "migraine headaches." (603).

On March 8, 2000, Smith and Biviano completed a "Psychiatric Report" in response to a request by the Commissioner. (604-06) The report noted that plaintiff "attempts to attend all scheduled appointments and when she does she uses therapy appropriately." (604). The report noted that plaintiff was afraid of medication and did not understand the importance of medication. (Id.) The report stated that plaintiff's mental illness had a "marked"[5] restriction on her activities of daily living. For example, the report stated that plaintiff "at times finds it very hard to leave her house." (605) The

[5]The report defines a "marked"impairment as an "impairment [that] seriously interferes with the ability to function independently, appropriately, and effectively." (605)

report also stated that plaintiff had “marked” difficulties in maintaining social functioning. In that regard, the report noted that plaintiff “finds it very hard to interact with others and to communicate,” “becomes very upset” and is “easily frustrated.” (Id.) The report stated that plaintiff’s deficiencies of concentration, persistence or pace resulted in “frequent failure” to complete tasks in a timely manner. For example, Biviano and Smith’s report noted that plaintiff reported decreased concentration, motivation, and energy due to voices in her head and headaches. Regarding plaintiff’s ability to understand, remember, and carry out instructions in a work setting, the report stated that plaintiff “appears to understand and [be] able to carry out very simple tasks with much prompting.” (606)

Plaintiff began treatment with a new psychiatrist, Brenda Bremer, M.D. (“Bremer”), in December 2001. On February 27, 2002, Bremer noted that she reviewed plaintiff’s medications with her, and that Risperdal, Zyprexa, trazodone, Paxil, Celexa, Zoloft, and Adderall were not helping. (631) On April 19, 2002, Bremer reported that plaintiff was “shaky, nervous, jittery, and sweaty,” and wanted the door of the room left open. (639) On May 31, 2002, Bremer stated that plaintiff’s medications weren’t working. (641) On July 1, 2002, Bremer stated that plaintiff was complaining of headache pain, and reported having difficulty telling dreams from reality, and had experienced a panic attack. (643) Bremer stated that plaintiff “meets criteria for a panic disorder,” and she prescribed the medication “EffexorXR.”

Bremer completed a disability report on September 11, 2002. (617-22) Bremer noted that she had been treating plaintiff since December 12, 2001, and that plaintiff was seen for treatment one-to-two times per month. Bremer stated that plaintiff

suffered from a psychotic disorder and migraines, which impaired her mood and affect, as well as her memory, perception, concentration, judgment, and insight. The report noted that plaintiff had a “moderate” restriction of her daily activities, affecting her ability to maintain a household, pay bills, and visit friends and family. The report stated that plaintiff had a “marked” impairment in social functioning, which affected her ability to get along with others, receive and carry out instructions, communicate, and observe etiquette. (618-19) The report also stated that plaintiff had a “marked” impairment in maintaining concentration, persistence, or pace. For examples of these impairments, the report stated that plaintiff

> goes through periods when she becomes extremely anxious and paranoid. This makes it hard for her to leave her home, [and] difficult for her to spend time with others because she cannot tolerate other people’s behaviors. She also has great difficulty concentrating at times and when she can’t focus she does not take in information well.

(619) The report further stated that plaintiff had experienced extended episodes of deterioration or decompensation: “Tyneshia has had at least three episodes since starting treatment . . . where she has been increasingly depressed, anxious and psychotic. When this happens [she] has great difficulty leaving her home, she has missed work, has stopped paying bills [and] was evicted at least once.” (619) The report indicated that plaintiff did not have the ability to understand and carry out instructions, to respond appropriately to supervisors or co-workers, or to handle customary work pressures, because when she “is psychotic she will become paranoid [and] suspicious of co-workers. She can also become very depressed and anxious .” Notably, the report stated that plaintiff did not have the ability to perform her past relevant work on a sustained basis. (621)

On September 12, 2002, plaintiff's representative sent the various medical notes and reports from Bremer discussed above, to the Social Security Administrative Law Judge ("ALJ"), in advance of the benefits hearing scheduled for September 17, 2002. (616-53) Plaintiff also sent a note from Dr. Courtsal, who, as discussed above, was plaintiff's primary care physician, dated June 4, 2002, stating:

> Tyneshia Brown is unable to work currently due to her major depression, psychosis, schizoaffective disorder, and migraine headaches. She has severe work restrictions with respect to understanding requests, concentration, appropriate behavior with co-workers, and punctuality. She is not capable of work of any type at this time.

(648).

Following the hearing before the ALJ on September 17, 2002, plaintiff sent additional medical information to the ALJ on September 23, 2002, which she asked the ALJ to consider. Specifically, she sent a letter from Dr. Bremer, dated September 23, 2002, which stated:

> Ms. Brown clearly fits the 12.03 diagnostic category [schizophrenic, paranoid and other psychotic disorders]. Her symptoms are continuous auditory hallucinations (A.I) marked difficulties in maintaining social function despite her efforts (B.2), marked difficulties in maintaining concentration (B.3). She may also have delusional thinking (A.I) of a paranoid nature.
>
> Ms. Brown also fits the 12.04 diagnostic category of Affective Disorders. She meets the criteria of A.1, i.e. anhedonia (a.), severe sleep disturbance (e.), feelings of worthlessness (f.) And psychomotor agitation (d.). These symptoms result in marked difficulties in maintaining social functioning (B.2) and marked difficulty in maintaining concentration, persistence, and pace (B.3). These symptoms have persisted for many years.
>
> She also has some symptoms of a pervasive developmental disorder in that she is easily preoccupied with spinning objects and has failed to develop normal peer relationships. Despite these impairments, Ms. Brown has obtained several jobs which she then loses, in part due to lost

> time from severe and frequent migraine headaches, and in part because of her odd/inappropriate behaviors caused by her psychiatric difficulties. She has a strong desire to be 'normal', and knows she is not.
>
> Her therapist and I strongly and sincerely believe that Ms. Brown's psychiatric disabilities prevent her from maintaining competitive employment, despite her best efforts, and severely impair her quality of life.

(659).

In addition to the foregoing medical evidence, the record contains certain opinions from non-treating, non-examining agency review physicians, who rendered opinions based solely upon their review of medical records. For example, Anthony Cannuli, M.D. ("Cannuli"), completed a "Mental Residual Functional Capacity Assessment" on June 9, 1999, in which he stated that plaintiff was "moderately limited" in her ability to understand, remember, and carry out detailed instructions, and to accept instructions and receive criticism from a supervisor. (395-96) Cannuli opined that plaintiff appeared "capable of . . . simple, rote tasks." (400) Cannuli stated that plaintiff had only a slight degree of limitation in her social functioning, and would seldom have deficiencies in concentration, persistence or pace. (406) Cannuli considered plaintiff to have an affective disorder and personality disorder, but not a schizophrenic, paranoid, or other psychotic disorder (399-400) At some time prior to June 1999, Richard Eales, M.D. ("Eales") completed a "Physical Residual Functional Capacity Assessment," stating that plaintiff had no physical impairments. (408-15) Eales noted that plaintiff claimed to suffer from migraines, but he apparently disregarded that complaint since plaintiff's MRI was normal. (412)

STANDARDS OF LAW

______42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above, the defendant may carry its burden by resorting to the Medical Vocational Guidelines or

"grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then defendant cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[6] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[7]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the

---

[6]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[7]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

PROCEDURAL BACKGROUND

Plaintiff applied for disability benefits in 1996 and again in 1997, claiming to be disabled by headaches. Both of those applications were denied. Plaintiff again applied for disability benefits on December 21, 1998, claiming that, in addition to the headaches, she was also suffering from depression and anxiety. (378)

A hearing was held before the ALJ on May 10, 2000. The ALJ denied plaintiff benefits in a decision issued on June 28, 2000. The ALJ found that plaintiff had severe impairments, namely, affective disorder and migraine headaches. However, the ALJ found, at the fourth step of the five-step sequential analysis, that plaintiff was capable of performing her past relevant work as a cook, nurse's aid, and bus attendant. Plaintiff appealed the ALJ's decision, and the Social Security Appeals Council ("Appeals Council") remanded the case for a new hearing by decision dated November 27, 2001. The Appeals Council remanded the case because it found that the ALJ had failed to consider certain medical evidence, including the June 30, 1998 statement by Dr. Courtsal, and the report by Dr. Biviano. The Appeals Council specifically directed that, on remand, the ALJ was to do the following: 1) obtain additional medical evidence from Courtsal and Biviano; 2) complete a psychiatric review technique form; 3) re-evaluate plaintiff's residual functional capacity; 4) obtain the opinion of a medical expert, if warranted; and 5) obtain evidence from a vocational expert, if needed. The ALJ held a supplemental hearing on September 17, 2002, and complied with all of the directions of

the Appeals Council.[8]

Following the second hearing, the ALJ, on November 25, 2002, issued a second decision denying benefits. (27-37) Petitioner appealed to the Appeals Council, and submitted, *inter alia*, Dr. Bremer's September 23, 2002 report, which she had also submitted to the ALJ prior to his decision. (15) The Appeals Council denied plaintiff's request for review on June 25, 2004. (11) Plaintiff commenced the instant action on August 24, 2004. Plaintiff filed the subject motion for judgment on the pleadings on July 22, 2005, and defendant cross-moved to remand the case for a new hearing on July 25, 2005.

The Court notes that plaintiff is currently receiving SSI disability benefits, after another application that she filed on May 13, 2003, was granted, apparently without a hearing. (18)

THE HEARING AND THE ALJ'S DECISION

At the supplemental hearing on September 17, 2002, the ALJ obtained testimony both from a medical expert and from a vocational expert. The medical expert was Ralph Sibley, Ph.D. ("Sibley"), a clinical psychologist. Sibley's testimony was based on his review of plaintiff's medical records, including those from Dr. Bremer, and his observation of plaintiff at the hearing. (167, 179-80) Sibley opined that plaintiff suffered from "major depression with psychotic features, and panic disorder," which did not meet the criteria of any listed impairment. (178) Sibley stated that plaintiff's activities of daily

---

[8]The ALJ asked plaintiff to submit any additional evidence from Courtsal and Biviano on July 19, 2002. (271) The ALJ received additional information from Courtsal, but not Biviano, because plaintiff had stopped seeing Biviano. However, the ALJ obtained additional information from plaintiff's new psychiatrist, Bremer.

living and social functioning were "moderately"[9] impaired, and that she would have "frequent" deficiencies of concentration, persistence or pace, resulting in a failure to complete tasks. (178-79) Sibley further stated that plaintiff had one or two episodes of deterioration or decompensation in a work setting. Sibley indicated that plaintiff would have "difficulty in relation with supervisors, [and] difficulty in maintaining attention and concentration without unusual rest periods during the course of a normal work day." Sibley also stated that plaintiff would have difficulty "[g]etting to work on a regular basis," and difficulty "understanding and being able to carry out complex instructions." (181-82) Sibley also noted that plaintiff would probably have difficulty with co-workers, due to her tendency to talk to herself. (187) Moreover, Sibley commented that plaintiff would need "some social stimulation" while she was working, otherwise she would "start interacting with her voices, and lose attention to what she was supposed to be doing." (182) To summarize, Sibley opined that plaintiff would have difficulty getting to work on a regular basis, would need more rest periods than the average employee, would have difficulty relating to co-workers, and would need social stimulation to keep her on task.

The ALJ then obtained testimony from a vocational expert, Julie Andrews ("Andrews"). Andrews testified that plaintiff's previous employment as a recreation aide, school bus monitor, and fast food worker, would be classified as unskilled light work, while her previous work as a hand launderer and sandwich maker would be unskilled medium work. (188-89). The ALJ asked Andrews to assume that plaintiff had

[9]When plaintiff's representative asked Sibley why he disagreed with the treating physicians' opinions concerning the degree of plaintiff's limitations, he explained, for example, that while the treating physicians stated that plaintiff had great difficulty functioning, the actual treatment notes showed that plaintiff was able to drive, shop, cook, clean, do laundry, and pay bills. (184)

no exertional limitations, and the following non-exertional limitations: moderate impairment in remembering and carrying out detailed instructions; moderate impairment in ability to make judgments on simple, work related decisions; and moderate impairment in ability to respond appropriately to supervisors and co-workers. Andrews responded that, even with those impairments, plaintiff would be able to perform her past relevant work as a hand launderer. Andrews also stated that a person with those limitations would be able to perform other jobs in the national economy. For example, Andrews stated that a person with the limitations set forth in the hypothetical could work as a laundry laborer, DOT 361,687-018, and industrial cleaner, DOT 381.687-018.

The ALJ next asked Andrews to change the hypothetical, and assume that the impairments described above were "marked," as opposed to only "moderate." Andrews stated that the person with those impairments would probably not be able to work as a hand launderer, or perform any other occupations in the national economy. (192) Significantly, neither of the ALJ's hypotheticals asked Andrews to factor in a need for more frequent rest breaks, a need for social stimulation, or difficulty getting to work.

On cross-examination, plaintiff's representative asked Andrews questions that incorporated the limitations that Sibley identified, such as the need for rest breaks and social stimulation, and difficulty in making it to work. Andrews admitted that, assuming that plaintiff needed more rest periods than most employees, she would not be able to perform the jobs of hand launderer, laundry laborer, or industrial cleaner, without "special circumstances being put into place." (193-94) Lewis also admitted that a person would be unable to perform those jobs if they would have more than one day of missed work per month. (194) Andrews further stated that, a person with plaintiff's

limitations, as described by Dr. Sibley, would normally require a "job coach"[10] in order to remain employed. (195)

Applying the five-step sequential analysis discussed above, the ALJ found, first, that plaintiff had not engaged in substantial gainful activity during the relevant period. Second, he found that she had two severe impairments: major depression with psychotic features, and panic disorder. Third, the ALJ found that plaintiff's "severe impairment" did not meet or equal the criteria of any impairment(s) listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("the Listings")(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). Fourth, the ALJ found that plaintiff had the residual functional capacity to perform her past relevant work as a hand launderer. Despite having made this finding, the ALJ proceeded to the fifth step fo the five-step sequential analysis, and further found that plaintiff could perform other jobs in the economy, namely, laundry laborer and industrial cleaner. The ALJ did not, in his decision, discuss Sibley's and Andrews' testimony regarding plaintiff's need for frequent rest breaks, social stimulation, or a job coach.

It is evident from his decision that the ALJ questioned the veracity of plaintiff's psychological complaints. For example, the ALJ made the following observations:

Medical reports show only intermittent psychiatric counseling with frequent

---

[10]The Code of Federal Regulations describes the use of a "job coach" as a type of "supported employment." 29 CFR 1630.9; *see also, E.E.O.C. v. CEC Entertainment, Inc.*, 98-C-698-X, 2000 WL 1339288 at *2 (W.D.Wis. Mar. 14, 2000) ("The role of a job coach is to assist in teaching the disabled individual the tasks that he is expected to perform, provide on-site supervision during the early phases of the individual's employment, monitor the employee's progress and serve as a liaison between the employee and the employer. In theory, the job coach is supposed to "fade" over time; in other words, to provide less and less support as the individual becomes more independent on the job. The job coach also keeps case notes that record the individual's progress on the job.")

> 'no shows'
>
> ***
>
> [C]laimant testified that she was not working 'because work was boring'
>
> ***
>
> [S]he did not attend any treatment from May 21, 1999 to September 20, 1999.
>
> ***
>
> The undersigned finds that the claimant's allegation of 'voices' is vague and exaggerated.
>
> ***
>
> [S]he spends much of the day in her room listening to popular music. A person suffering constant, unremitting, disabling migraine headaches could not do this, nor would she want to.
>
> ***
>
> The [ALJ] finds the claimant to be entirely unpersuasive. Her activities of daily living . . . are in direct conflict with her complaints.

(27-37).

ANALYSIS

Applying the legal principles discussed above to the facts of this case, the Court agrees with the parties that the ALJ committed legal errors, which require that the Commissioner's decision be reversed. In that regard, it is well settled that

> the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him.

*Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (citation and internal quotations omitted). Here, the ALJ improperly substituted his own opinion for the opinions not only of plaintiff's treating physicians, but also the opinions of Sibley. The ALJ found plaintiff not disabled, based primarily on her activities of daily living, such as the fact that she listened to music, sat in the sun, stayed up late at night, visited with friends, and accompanied a relative on fishing trips. Apparently, the ALJ was also bothered by the

fact that plaintiff had told her doctors on various occasions that she found work “boring.” However, the ALJ does not cite any medical evidence that these activities and comments are inconsistent with plaintiff’s claimed disability. Sibley listened to the same testimony regarding plaintiff’s activities of daily living, and nonetheless agreed with plaintiff’s treating physicians that plaintiff would have significant limitations on her ability to work, as discussed above. Moreover, the ALJ’s hypotheticals to Andrews did not accurately reflect plaintiff’s limitations, as documented by plaintiff’s treating physicians and as testified to by Sibley.

The remaining issue is whether the matter should be remanded for a new hearing, or remanded solely for the calculation of benefits. The Second Circuit has stated that,

> [u]pon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard, we generally vacate and instruct the district court to remand the matter to the Commissioner for further consideration. Where, however, the reversal is based solely on the Commissioner's failure to sustain his burden of adducing evidence of the claimant's capability of gainful employment and the Commissioner's finding that the claimant can engage in . . . work is not supported by substantial evidence, no purpose would be served by our remanding the case for rehearing.

*Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000) (citations and internal quotation marks omitted). In the instant case, the record is complete after two hearings. However, the ALJ’s conclusion that plaintiff is capable of performing work as a laundry laborer, hand launderer, and industrial cleaner is not supported by substantial evidence in the record, and is contrary to the opinions provided by his own medical expert and vocational expert. Plaintiff’s application for benefits has also now been pending for approximately seven years, which is an additional factor weighing in favor of the Court’s ruling. *Id*. at

124 ("[W]e believe this disposition [remanding solely for calculation of benefits] to be particularly appropriate given that [plaintiff's] application has been pending more than six years.") Accordingly, the Court finds that it is appropriate to remand this matter solely for the calculation of benefits.

CONCLUSION

For the reasons discussed above, defendant's application [#11] is denied, plaintiff's application [#10] is granted, and this matter is remanded to the Commissioner solely for the calculation of benefits.

So Ordered.

Dated: Rochester, New York
November 29, 2005

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge